HATHAWAY v. PORTER ROYALTY POOL, INC.

1. MINES AND MINERALS—OIL POOL ROYALTY AGREEMENT—FRAUD—
EVIDENCE.
    In suit for rescission of oil pool royalty agreement and for an
    accounting, brought by owners of land on which producing
    well was drilled, evidence sustained finding of trial court that
    no fraudulent representations were made by defendants in
    the preliminary organization of the pool or in its incorpora-
    tion.

2. ASSOCIATIONS—DEFINITION OF SYNDICATE.
    A syndicate is defined as a word of business and not of legal
    art, employed widely in the dialect of finance describing an
    association of individuals formed for the purpose of conduct-
    ing and carrying out some particular business transaction, and
    is said to be somewhat like a joint adventure.

3. JOINT ADVENTURES—DEFINITION.
    A joint adventure is an enterprise undertaken by several persons
    jointly, differing from a partnership in that it relates only to
    a single transaction and from joint ownership and tenancy
    in common in that they lack the feature of adventure.

4. SAME—EVIDENCE.
    What amounts to a joint adventure depends largely upon the
    terms of the particular agreement in controversy, upon the
    construction which the parties have given it, and upon the
    nature of the undertaking as well as upon other facts.

5. SAME—PURPOSE—PROFITS—LOSSES.
    A joint adventure contemplates an enterprise jointly undertaken,
    an association of such joint undertakers to carry out a single
    project for profit, and that profits are to be shared, as well
    as the losses, though the liability of a joint adventurer for
    a proportionate part of the losses or expenditures of the joint
    enterprise may be affected by the terms of the contract.

6. SAME—CONTRIBUTION—COMMUNITY OF INTEREST—CONTROL.
    There must be a contribution by the parties to a common under-
    taking to constitute a joint adventure and a community of
    interest as well as some control over the subject matter or
    property right of contract.

7. SAME—CREATION—INTENT.

Whether the parties to a particular contract have thereby created, as between themselves, the relation of joint adventurers or some other relation depends upon their actual intention, and such relationship arises only when they intend to associate themselves as such, which intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts.

8. SAME—POOLING OF STOCKS.

Where stocks are put into a common pool so that each owner loses his title to separate shares, and acquires an undivided interest in the whole, the transaction is a joint adventure.

9. MINES AND MINERALS—OIL ROYALTY POOL—JOINT ADVENTURES—INTENT.

Where all participants in oil royalty pool were owners of certain royalty interests in a restricted class, limited to those having rights in land of a certain definite, prescribed area, determined to pool their rights to royalties in oil that might be produced in lands owned by any of them so that they would share the proceeds of royalties from the lands of all of the owners in certain stipulated proportions, expenses of management being paid from proceeds before distribution of dividends to pool members, the parties intended to enter into a joint adventure and agreement between them constituted a joint adventure.

10. JOINT ADVENTURES—CORPORATIONS—SALE OF STOCK—BLUE SKY LAW.

Character of joint adventure of project, entered into by owners of certain royalty interests in a restricted class, limited to those having rights in land in a certain definite, prescribed area, who determined to pool a portion of their rights to royalties in oil that might be produced in lands owned by any of them so that they would share the proceeds of royalties from the lands of all of the owners in certain stipulated proportions, was not changed by formation of corporation to whom pool members conveyed a portion of their royalty interest and whose purpose was to effect that distribution of dividends in proportion agreed to, the corporation, by its duly empowered officers, being merely a convenient means of accomplishing the purpose of the joint adventure; hence issuance of stock to pool members was not a sale of securities prohibited by the blue sky law (2 Comp. Laws 1929, § 9769 *et seq.*).

11. SAME—CORPORATIONS—INTENT.

While the formation of a corporation and issuance of stock therein would seem to preclude joint ownership, it does not necessarily negative the existence of a joint adventure when such was the manifest purpose of the parties.

12. SAME—BLUE SKY LAW.

A joint adventure was not within the blue sky law as it existed in 1933 (2 Comp. Laws 1929, § 9769 *et seq.*).

13. SUNDAY—CONTRACTS.

Where a contract has been executed by one party on Sunday, without the knowledge of the other party, it is valid as to the innocent party and may be enforced by him.

14. SAME—OIL POOL ROYALTY CONTRACT.

Oil pool royalty contracts, signed by some members of the pool on Sunday, would nevertheless be enforceable against such members where fact they signed on Sunday was not known to the promoters or other members of the pool who had signed like contracts.

Appeal from Midland; Hart (Ray), J. Submitted June 14, 1940. (Docket No. 65, Calendar No. 40,653.) Decided January 6, 1941. Rehearing denied April 11, 1941. Amendatory opinion filed July 30, 1941. Reconsideration denied October 6, 1941.

Bill by Glenn R. Hathaway and Mildred J. Hathaway against Porter Royalty Pool, Inc., and others to remove cloud on title, rescind royalty agreement, and for an accounting. Defendants Wale and certain others filed cross bills asking for the same relief. Remaining defendants filed answers and cross bills seeking enforcement of contract and for an accounting. From order granting relief to plaintiffs and cross-plaintiffs, all parties appeal. Reversed and remanded for entry of decree in favor of defendants seeking enforcement of contract. On petition for amendment and clarification of decree. Petition granted. (See *post*, 733 *et seq.*)

*Smith & Hunter,* for plaintiffs.

*Cook, Smith, Jacobs & Beake,* for defendants and cross-plaintiffs Wyant and others.

*Ralph J. Hyde,* for defendants and cross-plaintiffs William M. and Sophia E. Carter.

*Joel E. Kahn,* for defendant and cross-plaintiff Huff.

*Chester E. Morris* and *Shields, Ballard, Jennings & Tabor,* for defendants Keyworth.

*Hand & Hand,* for defendants and cross-plaintiffs Baxter and Bushrie.

*Robert J. Curry,* for defendants and cross-plaintiffs Wale and others.

*Charles H. Goggin, Miller, Bevan, Horwitz & Des Roches, Ralph L. Goggin* and *Alfred H. Sauer,* for defendants Bangs and others.

*F. A. Calvert* and *Lowell Jones,* for defendants Pure Oil Company and Pure Transportation Company.

McALLISTER, J.  Plaintiffs filed their bill of complaint to remove a cloud on title from their lands in Porter township of Midland county and asked rescission of a royalty agreement and an accounting for oil removed from the lands in question.  Their bill is based upon allegations of fraud and the sale of stock in violation of the blue sky law, 2 Comp. Laws 1929, § 9769 *et seq.* (Stat. Ann. § 19.741 *et seq.*).  The trial court found that there was no merit to the claim of fraud, but granted the relief sought on the ground of violation of the statutes relating to the sale of corporate securities.

The suit was brought against 154 defendants owning about 95 parcels of land, as well as others, including promoters and trustees; and the defendant owners of about 30 other parcels filed cross bills

asking the same relief as prayed for by plaintiffs. The remaining defendants filed answers.

The controversy has for its background the discovery of oil in Chippewa township in Isabella county in the early part of 1928. Subsequent thereto, in 1929 and 1930, many commercially-producing oil wells were drilled in Greendale township in Midland county.

Defendant Kirkham was an expert geologist of large experience. He held the office of executive vice-president, general manager, director, and chief geologist of the Michigan Pacific Oil & Gas Company, a corporation with offices in New York City. Defendants Bangs and McCutcheon were promoters from Detroit who had had previous experience in the organization of oil and gas royalty pools.

Kirkham, after association with and work for the Washington State Geological Survey, the United States Geological Survey, and the United States Bureau of Mines, came to Michigan in 1928 on behalf of certain private interests for the purpose of making a survey of the location of oil deposits. During 1929, he made an investigation and a survey of the counties of Alpena, Presque Isle, Montmorency, Cheboygan, Alcona, and Huron. He also made a study of Tuscola, Sanilac, and Midland counties.

In 1930, the Michigan Pacific Oil & Gas Company was organized, and defendant Kirkham reported, in the same year, to the company, the advisability of securing oil leases in Midland county. Much of the land of the township had been leased to other oil companies, but Kirkham was able to secure leases for the company on a certain area. One of such leases was on the northwest ¼ of the northwest ¼ of section 26 of Porter township, upon which drilling operations were commenced and oil produced in small quantities on August 28, 1931. This well was known as the Joseph Otway No. 1; and

the discovery of oil in this location stimulated activity in the development projects.

It was after the production of oil from this well that defendants Bangs and McCutcheon took steps to organize an oil and gas royalty pool in Porter township. They consulted with defendant Kirkham, and employed him to map out a potential oil-producing area in the township which comprised, roughly, the central portion of the township, together with connected outlying acreage. They also caused to be prepared agreements to be executed by owners of the land within the area. This agreement provided for a pooling, by the owners signing the contract, of one-half of the royalties that might be received by them from oil companies as a result of the production of oil and gas.

Among the provisions of the contract were stipulations of conveyance by the landowners of one-half of their oil royalty rights to three trustees for purposes of incorporation. It was further set forth in the contract and an escrow agreement that a corporation was to be organized within five years, on condition, however, that owners of 4,000 surface acres of land within the prescribed area should have entered into such an agreement and that also within the said period a well should be discovered on such land from which oil and gas would be produced in commercial quantities. It was further provided that, in the proposed company, common stock would be issued, upon incorporation, to the owners signatory to the contract, in proportion to their acreage; with the effect that, when oil would be produced from any of the pooled land, the income from the royalties would be paid into the corporation and distributed among the members according to their holding of stock, the ratio being that of acreage pooled by each landowner to the total acreage in the pool. The basic purpose of the pool was to protect

the oil royalty owner against the danger of his own parcel of land being nonproductive and to insure that all members of the pool would participate in any oil produced in the pool area no matter where found therein. The contract also set forth that the promoters, Bangs and McCutcheon, would pay all the expenses of the venture up to the time that such corporation was organized; and that said promoters, in consideration of their services in the formation and organization of the pool and the corporation, would receive 25 per cent. of the common stock issued to each owner signing the contract. Bangs and McCutcheon agreed with Kirkham to transfer one-fifth of their shares to him in consideration of his services.

At first, the plan for a pooling agreement met with little enthusiasm among the landowners in the area because of a feeling of optimism that the properties would generally produce oil in large quantities. But after the drilling of several "dry holes," apparently it was recognized that the landowners would be more secure under a pooling arrangement, and by April 1, 1932, numerous owners had pooled their oil rights, according to the agreement, in more than 4,000 acres of land within the prescribed area.

One of the conditions of the agreement having been fulfilled, namely, that owners of at least 4,000 surface acres enter into the agreement within the required time, a meeting of such owners was held on April 6, 1932, at the Grange Hall in Porter township for the purpose of perfecting the organization. At this meeting a bylaw committee was chosen, and thereafter legal counsel was employed. Such counsel advised the group that there could be no organization of the contemplated corporation until the second condition of the agreement was fulfilled, namely, that there be a producing well on the property. Subsequently a producing well was brought

in on the pool lands, and parties to the pooling agreement were then given notice of a meeting to be held for the purpose of adopting bylaws and signing and executing articles of incorporation.

The meeting was held April 24, 1933, and was attended by most of the parties to the agreement, but inasmuch as the bylaws had not yet been finally approved, it was determined not to execute the articles of incorporation until later, and a waiver of notice of a meeting to which the group adjourned was signed by many of the parties present. However, there had been raised the question of whether the pooling arrangement came within the provisions of the blue sky law, 2 Comp. Laws 1929, § 9769 *et seq.* (Stat. Ann. § 19.741 *et seq.*), and accordingly a committee proceeded to the office of the corporation and securities commission at Lansing, and apparently was advised that the organization did not come within the provisions of that statute.

Thereafter, on April 28th, a meeting was held in the bank at St. Louis, Michigan, at which many of the plaintiffs and cross-plaintiffs were in attendance. The group was then advised of the meeting of the committee with the securities commission, and thereafter articles of incorporation were signed by 25 incorporators. A temporary board of directors was elected; the articles were accepted for filing with the secretary of State; and the Porter Royalty Pool, Inc., was duly incorporated on May 2, 1933. Another meeting of the members of the pool was held in the high school at St. Louis on May 10, 1933, when the bylaws which had been prepared were submitted. Considerable discussion was had with reference to the organization, and permanent directors were elected, among whom were four present cross-plaintiffs. Thereafter, a secretary was elected; the board checked over the pool agreements and caused them to be recorded in the office of the

register of deeds. Stock certificates were issued, and orders were signed for royalty oil going to the pool under the agreement, and the corporate and franchise fees were paid. A resolution was passed authorizing legal proceedings against certain parties to the pooling agreement who refused to allow their oil to go into the pool.

During this time, oil wells were being brought in in the prescribed area, and by the latter part of 1933, about 20 successful wells had been drilled on the properties. From the oil thus produced the Porter Royalty Pool, Inc., received the money paid therefor, and pursuant to transfer and division orders, apportioned the proceeds among the pool members in accordance with their respective shares. Such proceeds, as dividends, were paid by check to the members of the pool each month from September, 1933, up to and including January, 1934. Most of the members cashed their checks. A few retained them and afterward tendered them back to the corporation.

However, when the drilling of wells began to prove successful, several of the members of the pool, upon whose lands such producing wells were drilled, refused to accept their stock in the corporation, or refused to sign the orders necessary to bring the oil produced into the pool in order to enable the corporation to collect the money therefor and distribute it according to the agreement to the various members in proportion to their holdings.

When suits were instituted by the corporation against certain individuals for the enforcement of the agreement and for an accounting, the present bill of complaint was filed by plaintiffs Glenn R. Hathaway and Mildred J. Hathaway, parties to the pooling agreement against the corporation and all the parties to the agreement, alleging fraud and mis-

representation in the organization of the pool and the corporation; asking for rescission of the agreement because of alleged violation of the blue sky law; and praying for an accounting. Besides the above defendants, Bangs and McCutcheon, the promoters; Kirkham, the geologist; the trustees for purposes of incorporation; the Porter Royalty Pool, Inc.; the Pure Oil Company; the Pure Oil Pipeline Company; and the Simrall Pipeline Company were likewise made parties defendant, the last three solely for injunctive purposes because of their character as stakeholders. The answer and cross bill filed on behalf of the Porter Royalty Pool, Inc., and other parties in opposition to the claim of plaintiffs asked for enforcement of the pooling agreement and an accounting.

In granting plaintiffs' prayer for rescission of the agreement and an accounting, the court found that no fraud had been committed and dismissed the bill as to the trustees for incorporation and the defendant Kirkham.

The two principal questions before us for determination in this case are: whether there was fraud in the organization of the pool, whether the stock issued by the Porter Royalty Pool, Inc., to the various members of the pool was a sale of stock in violation of the provisions of the blue sky law; and whether the agreement executed by the pool members was within the prohibition of the said securities act.

The allegations of fraud are numerous and various. It is claimed that Bangs and McCutcheon, acting as the promoters of the enterprise, "held before the poor unsuspecting farmer the rosy bait of unlimited wealth, education for one and all, vacations in Florida, travel and fine homes, and, by fraudulent misrepresentation of every kind and nature,

present and promissory, possible and probable, reasonable and fanciful, until the sales resistance of the trusting farmer collapsed." More specifically, it was claimed that the promoters indicated to defendant Phineas Baxter that they could arrange to take care of his mortgage and taxes, and that Baxter signed the agreement on the oral understanding that it would be effective only when such incumbrance on his property was paid off. It is further claimed that the promoters represented to various parties that the producing Otway well was already in the pool, when it was only conditionally in the pool on an agreement that Otway's obligations would be refinanced by the promoters; that such promoters concealed the fact that the trustees were receiving a portion of the stock; that it was represented that the operating expenses would be very slight; that different agreements were being made with some landowners whereas it was represented that all were being treated alike; that it was represented that the promoters were expending much more money out of their own pockets for the benefit of the pool than was actually the fact. These and many more similar claimed fraudulent misrepresentations were alleged to have been made in order to secure the execution of the contracts.

We have carefully reviewed the extensive record and have come to the conclusion that no fraud whatever was practiced upon the complaining parties, who, incidentally, had the benefit of the advice of many of the most able members of the legal profession in this State throughout the entire proceedings. We are in accord with the finding of the trial court that no fraudulent representations were made by any of the defendants in the preliminary organization of the pool or in its incorporation.

However, the trial court, in accordance with the contention of the complaining parties, granted re-

scission of the agreement and an accounting on the ground that the agreement and the issuance of the stock to the complaining parties were in violation of the blue sky law.

On appeal from the decree it is contended that the agreement between the royalty owners and the trustees and promoters was an agreement for a joint adventure; that the incorporation was merely a convenient medium for effecting the purposes of such relationship; that the blue sky law, as it existed at the time of the agreement and the incorporation, had no application to joint adventurers; and that the issuance of stock of the corporation, formed to carry out the joint adventure, was not a sale of securities within the meaning of the said statute.

"The now widely-recognized legal concept of joint adventure is of modern origin. It has been said to be purely the creature of the American courts. The early common law did not recognize the relationship of coadventurers unless the elements of partnership were disclosed and proved, but it is now generally understood that two or more persons may, by combining their property or labor in a joint venture, create a status which, while having some or many of the characteristics of a partnership, is not identical therewith." 30 Am. Jur. p. 676.

Syndicates, like joint adventures, have only comparatively recently been brought into notice as subjects of legal consideration. They have generally been regarded, subject to some exceptions, as falling within the rules applicable to partnerships. In some aspects, they seem to be even more closely related to joint adventures. 30 Am. Jur. p. 677. A syndicate is defined as a word of business and not of legal art, employed widely in the dialect of finance describing an association of individuals formed for the purpose of conducting and carrying out some

particular business transaction, and is said to be somewhat like a joint adventure. 60 C. J. p. 1203.

On the whole, however, it must be said that courts have not laid down any very certain, satisfactory or all-inclusive definition of a joint adventure, nor have they established any fixed or certain boundaries thereof, but, in most cases, they have been content to determine merely whether the given or conceded facts in the particular case constituted the relationship of joint adventurers. (30 Am. Jur. p. 678.) See *State, ex rel. Ratliffe,* v. *Superior Court for Whitman County,* 108 Wash. 443, 449 (184 Pac. 348). Joint adventure has been defined, however, as an enterprise undertaken by several persons jointly. *Wyoming-Indiana Oil & Gas Co.* v. *Weston,* 43 Wyo. 526, 535 (7 Pac. [2d.] 206, 80 A. L. R. 1037); as an association of two or more persons to carry out a single business enterprise for profit, *Fletcher* v. *Fletcher,* 206 Mich. 153. It is said, for instance, that such an enterprise differs from a partnership because it relates only to a single transaction, *Fletcher* v. *Fletcher, supra;* and that a joint adventure is distinguishable from joint ownership and tenancy in common because the latter lacks the feature of adventure. *Bond* v. *O'Donnell,* 205 Iowa, 902, 909 (218 N. W. 898, 63 A. L. R. 901).

The courts have not laid down an exact definition of what constitutes a joint adventure nor is it possible to enunciate a general rule by means of which the question as to what amounts to a joint adventure can be answered, because such an answer depends largely on the terms of the particular agreement in controversy, upon the construction which the parties have given it, upon the nature of the undertaking, as well as upon other facts. See 30 Am. Jur. p. 680.

It can be said that a joint adventure contemplates an enterprise jointly undertaken; that it is an asso-

ciation of such joint undertakers to carry out a single project for profit; that the profits are to be shared, as well as the losses, though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract. See 17 Ann. Cas. 1022, 1025; 24 Ann. Cas. 202, 203, and 39 Ann. Cas. 1210, 1214. There must be a contribution by the parties to a common undertaking to constitute a joint adventure (see annotation, 63 A. L. R. 909, 910); and a community of interest as well as some control over the subject matter or property right of contract. *Griffiths* v. *Von Herberg,* 99 Wash. 235 (169 Pac. 587); *Darling* v. *Buddy,* 318 Mo. 784 (1 S. W. [2d.] 163, 58 A. L. R. 493).

Whether the parties to a particular contract have thereby created, as between themselves, the relation of joint adventurers or some other relation depends upon their actual intention, *Reid* v. *Shaffer,* 249 Fed. 553; and such relationship arises only when they intend to associate themselves as such. *Berkey* v. *Railway Co.,* 244 N. Y. 84 (155 N. E. 58, 50 A. L. R. 599). This intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts. *Gleichman* v. *Famous Players-Lasky Corp.,* 241 Mich. 266.

Considering the foregoing as illustrative of certain general characteristics of the relationship of joint adventurers and certain elements which are generally regarded as incident thereto, we turn to the transaction and agreement between the parties in the case before us.

We begin with the fact that the prospective participants in the pool, prior to their entering into any agreement, were the owners of certain royalty interests. All of the participants belonged to a restricted class, limited to those having rights in land of a certain definite, prescribed area. Their inter-

ests were in royalties on oil that might be produced on the lands owned by them or in which they had an interest within this area. They determined to pool one-half of their rights to royalties in oil that might be produced in lands owned by any of them so that they would share the proceeds in certain stipulated proportions.

Each owner agreed to sacrifice his right to royalties in his own land in return for the acquisition of a right to an undivided interest in rights to the whole of the lands of all the owners; and each owner intended to contribute his individual rights in order to share jointly with the others in the entire pool. The expenses of the management of the pool were to be paid out of proceeds received for the oil before the proportionate "dividends" were paid to pool members. There were no losses to be paid by the members due to the fact that, because of the inherent nature of the enterprise, no losses could result. The entire project was single and limited to the prescribed lands in Porter township. The agreement between the owners brought about a common interest on their part in. the development of the oil field and joint participation in the undertaking and financial results. Here, there is an association of persons to carry out a single enterprise for profit— an enterprise undertaken by several persons jointly, with a sharing of profits. The bylaws adopted provided that no properties could be added and stock given for same after incorporation of the company, except by unanimous vote of the stockholders; nor could the bylaws be amended with reference to the agreement by which the company came into existence "except by the unanimous vote of all stock issued and outstanding." This kept a large measure of control in the hands of the members of the pool who not only, in these particulars, were obliged to act jointly, but unanimously; and to the contribu-

tion by the various owners to the joint enterprise was added the feature of adventure, in exchanging their chances of profits in their own lands for the chances of participation in profits from the lands of the other owners.

It has been held that where stocks are put into a common pool so that each owner loses his title to his separate shares, and acquires an undivided interest in the whole, the transaction becomes a joint adventure. *Spier* v. *Hyde,* 92 App. Div. 467 (87 N. Y. Supp. 285).

It is our conclusion that the parties intended to enter into a joint adventure and that there is no doubt that the agreement between them constitutes a joint adventure.

But the question then arises whether the incorporation of the project obliterates its quality of joint adventure, and whether the agreement to form a corporation for the carrying out of the joint adventure and the issuance of stock therein to the various owners, representing their proportionate interest, was in violation of the blue sky law and must be rescinded in accordance with the prayer of the complaining parties.

What was there about the agreement that would change the relationship and divest it of its quality of joint adventure? Does the fact that it was proposed to form a corporation to carry out the intent of the parties have such a result? The elucidation of this problem requires a consideration of the agreement itself, rather than the application of general rules.

[The corporation could not engage in business. It had only a nominal capital stock and a nominal paid-in capital. It could only incur small office expenses. It could pay no salaries to officers. It was not within the power of the officers or directors to use the assets, consisting of the assigned royalty contracts, for any purpose except to receive the proceeds therefrom and pay them out monthly to the holders of the shares. The corporation could make no investment of its funds or of the profits from the royalty agreements. It

could issue no stock, except to those who were members of the pool before the incorporation, except upon unanimous vote of all the stockholders, and then only to additional contributors of royalty rights within the prescribed area. No discretion was vested in the board of directors. The only function that the corporation could perform was to distribute to the various individual landowners their proportionate share of royalties received from this joint adventure—the pooling of all their individual interests in one common project.]*

The corporation, Porter Royalty Pool, Inc., was organized under the laws of this State (Act No. 327, Pub. Acts 1931 [Comp. Laws Supp. 1940, § 10135-1 *et seq.*, Stat. Ann. § 21.1 *et seq.*]) for the purpose of creating a legal entity which would serve as a practical and convenient medium to carry out the joint-adventure enterprise and agreement. The organization of the corporation was authorized by the joint-adventure agreement between the parties and such corporation was properly organized. The officers and board of directors of the corporation have all the power and authority of officers and directors of a corporation organized under Act No. 327, Pub. Acts 1931, insofar as necessary to carry out the intents and purposes of the joint-adventure agreement between the parties.*

The purpose of the corporation was not to conduct a business for profit, but to effectuate a distribution of royalties—merely to hold the pooled rights and to carry out the agreement of the parties as to their participation in the proceeds. No stock could be issued to anyone except to one of the joint adventurers, and all that the joint adventurers could receive from the corporation were the proceeds from the property that they had pooled with the others. Bangs and McCutcheon, it is true, did not contribute royalty contracts to the pool, and, in a sense, Kirkham could be said to be in the same class. But the pool owners themselves agreed that part of their own shares in the joint adventure

*See amendatory opinion appearing *post*, 733 *et seq.*—Reporter.

should go to them; and they were, in fact, joint adventurers with the owners, contributing their services and efforts to the joint project. The formation of the corporation in no way changed the intended relationship of joint adventure.

But can joint adventurers use the corporate form for convenience in carrying out their project?

In *Latimer* v. *Piper*, 261 Mich. 123, 131, it was said:

"It is claimed that each of the plaintiffs bought a certain amount of stock in a company and that it was not a joint venture. The testimony shows that the purpose of the parties was to carry out a single business enterprise for profit and that it was a joint venture. See *Keiswetter* v. *Rubenstein*, 235 Mich. 36 (48 A. L. R. 1049), in which *Fletcher* v. *Fletcher*, 206 Mich. 153, and *Alderton* v. *Williams*, 139 Mich. 296, are referred to. See, also, *Lane* v. *Wood*, 259 Mich. 266.

"We are satisfied that the corporation was merely a medium for carrying out the joint venture, and that plaintiffs were not interested in purchasing stock in a corporation but desired only to acquire the property together by the use of this convenient medium, each person taking a unit. The case of *Turtur* v. *Isserman*, 2 N. J. Misc. 1084 (128 Atl. 151), holds that although the employment of the corporate mechanism and the issuance of stock might, on its face, seem to preclude joint ownership, it does not necessarily *negative the existence of a joint adventure when such was the manifest purpose of the parties.*"

In *Schaffer* v. *8100 Jefferson Avenue East Corporation*, 267 Mich. 437, 446; it was said:

"Sometimes, when joint adventurers use the corporate form for convenience in carrying out their project, their mutual rights and liabilities will be determined in furtherance of and in harmony with

their joint purpose rather than with the form of their operation and the corporate entity will be recognized or ignored accordingly."

If it be the manifest intention of the parties to enter upon a joint adventure, the employment of the corporate mechanism and the issuance of stock do not negative the existence of such relationship.

Is an agreement for the use of the corporate medium, as a convenient method of carrying into effect a joint adventure, within the prohibition of the blue sky law, and is stock issued by such corporate medium in violation of the statute?

The blue sky law, 2 Comp. Laws 1929, § 9769 *et seq.* (Stat. Ann. § 19.741 *et seq.*), has been amended * but at the time of the execution of the agreement provided:

"Section 2. (a) The term 'commission' means Michigan securities commission, as hereinbefore created.

"(b) The term 'person' shall include a natural person, corporation, partnership, association, company, syndicate, and trust, incorporated or unincorporated. As used herein, the term 'trust' shall be deemed to include a common-law trust, but shall not include a trust created or appointed under or by virtue of a last will and testament or by a court of law or equity.

"(c) The term 'security' or 'securities' shall include any note, stock, treasury stock, bond, debenture, evidence of indebtedness, preorganization certificate or preorganization subscription, transferable certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas, or mining lease, collateral trust certificate, any transferable share, investment contract, or beneficial interest in or title to property

---

* Sections quoted were amended by Act No. 37, Pub. Acts 1935 (Comp. Laws Supp. 1940, §§ 9770, 9771).—Reporter.

or profits, or any other instrument commonly known as security.

"(d) The term 'sale' or 'sell' shall include an agreement to transfer an interest in securities, and an exchange. Any security given or delivered with or as a bonus on account of any purchase of securities, or any other thing, shall be deemed to constitute a part of the subject of such purchase and to have been sold for value. 'Sale' or 'sell' shall also include an attempt to sell, an option of a sale, a solicitation of a sale, a subscription or an offer to sell, directly or by an agent, or by a circular, letter, advertisement or otherwise: *Provided, however,* That nothing herein shall limit or diminish the full meaning of the terms 'sale' or 'sell' as used by or accepted in courts of law or equity.

"Sec. 3. No person, either acting personally or through an agent, or as the agent of another, shall on and after the date this act goes into effect, sell any security to any person in the State of Michigan contrary to the provisions of this act. The provisions of this act shall be liberally construed to the end that the purposes thereof may be accomplished by preventing fraud, deception and imposition on purchasers of securities."

In construing the above provisions this court has held that they do not apply to interest in a joint adventure or to the issuance of certificates evidencing such interests.

In *Lindemulder* v. *Shoup*, 258 Mich. 679, it was held that it was not necessary to have the approval of the securities commission of a joint adventure to acquire an oil lease. In that case receipts were issued to the joint adventurers by one who acted in the capacity of an agent or trustee.

In *Polk* v. *Chandler*, 276 Mich. 527, it was held that certificates of participation in a joint adventure were not subject to the blue sky law, and that validation by the securities commission of certificates of

participation contemplated to be issued by trustees to organizers of a syndicate for the purchase of land was unnecessary as the securities act was inapplicable to such certificates.

If the receipts and certificates of participation issued in the above cases in a joint adventure carried out by using a trustee or agent as a convenient medium are not such "evidences of indebtedness, preorganization certificates, preorganization subscriptions," "certificates of interest in a profit sharing agreement," "certificates of interest in an oil lease," or "beneficial interest in or title to property or profits" as are within the meaning of the statute when it defines "securities,"—then it can be said with equal force that the issuance of stock certificates, or certificates of interests or participation, preorganization certificates, preorganization subscriptions, or evidences of interest in property or profits, issued in a joint adventure, using the medium of a corporate form for convenience in effecting the joint adventure, is not the issuance of "securities" as contemplated by the statute. There is no more reason to hold the one issuance subject to the act than the other. The corporate form was not essential or necessary to effect the joint adventure; a trustee could have been used as the medium; it was only that the corporate form was the most convenient method of giving effective and practical supervision and handling of the royalties and making certain and regular distributions of the proceeds to the pool members. The corporate form was determined upon to carry out the purposes of the joint adventure; it was not the joint adventure that was determined upon to carry out the purposes of the corporation. The corporation was the adjunct of the joint adventure. The gist of the distinction is whether the enterprise is a joint adventure, re-

gardless of whether it is effected through the medium of a trustee, agent or corporate form.

The certificates issued in the instant case are unique as stock certificates. They recite the consideration for which they are issued, namely, the assignment of the interest in oil royalties in the described lands owned by the certificate holder; they provide that if, by prior incumbrance or lien, the corporation should lose its interest in the royalties, the stockholder will no longer share in the proceeds of the pool and be debarred from voting rights. Whatever the certificate be called, whether a certificate of stock or participation, it is evidence of the pool member's right to share in the joint adventure.

Plaintiffs, in their contention that the agreement was in violation of the securities act, cite the case of *Smith* v. *Fishback* (Tex. Civ. App.), 123 S. W. (2d) 771, as authority for their claim. In that case, a contract, similar in all pertinent respects to the one before us, was held to come within the prohibition of the provisions of a securities act embodying like provisions of the Michigan statute. The agreement contemplating the formation of a corporation was executed by the owners of royalty interests; the incorporation, however, was never completed, because the secretary of State refused to file the same unless it was approved under the Texas securities act.* This latter fact, however, would not distinguish the decision from the controversy in the instant case, as the contention made is that it was the agreement that was in contravention of the statute. However, it does not appear in the cited case that a joint adventure was relied upon as the ground of distinguishing the relationship from a sale of securities. That question has been submitted and argued in all

* See Vernon's Tex. Civil Stat. Art. 600a.—REPORTER.

of the cases in which this court has held that a joint adventure does not come within the blue sky law; and it has been insisted in these controversies, on the part of those seeking to cancel such agreements, that our statute did not make an exception in such a relationship and that the provisions of the act were applicable thereto. This court, however, has clearly held that a joint adventure is not within the statute as it existed at the time the agreement in question was entered into. Whether the Texas courts would so hold, we do not know. In the cited case the question was not determined. In the instant case, joint adventure constitutes, practically, the entire contention of defendants.

It is our conclusion that the agreement in question was an agreement for a joint adventure; that the formation of the corporation pursuant to the agreement in no way changed the relationship of joint adventure between the parties; that the agreement for the use of the corporate medium was only a convenient method of carrying into effect the joint adventure, and was not a contract within the prohibition of the blue sky law; that the issuance of stock by the corporation to the pool members was not the sale of securities within the intendment of the statute.

It is contended by certain of the complaining parties that they signed the agreements in question on Sunday and that they are, therefore, void. *International Textbook Co.* v. *Ohl,* 150 Mich. 131 (13 L. R. A. [N. S.] 1157, 121 Am. St. Rep. 612). The contracts in question were brought to the parties by an agent of Bangs and McCutcheon; they purported to be signed on a weekday and were so dated. The agent had no authority to sign. It is undisputed that the promoters were ignorant of the fact that the contracts had been signed by these parties on

Sunday. Where a contract has been executed by one party on Sunday, without the knowledge of the other party, it is valid as to the innocent party and may be enforced by him, for it would permit a wrongdoer to avoid the contract as against an innocent third party who executed the same in reliance upon its validity and would permit the wrongdoer to take advantage of his own wrong. This is the rule in jurisdictions where statutes render Sunday contracts void and not subject to ratification. See annotation in 67 A. L. R. 881. See *Vinton* v. *Peck*, 14 Mich. 287. Not only were the promoters ignorant of the fact that the contract was signed on Sunday, but all of the other signers of like contracts who may be said to have relied upon the alleged Sunday contracts were similarly ignorant. Under these circumstances there is no bar to the enforcement of such an agreement.

Other matters discussed are unnecessary to our determination of the case.

From the foregoing, it is our conclusion that the decree of the trial court, granting rescission of the agreement and an accounting, should be vacated, and a decree ordered entered in favor of appellants granting enforcement of the contract and an accounting as prayed, with costs to such appellants and cross-appellees.

SHARPE, C. J., and BUSHNELL, CHANDLER, NORTH, WIEST, and BUTZEL, JJ., concurred. The late Justice POTTER took no part in this decision.