PEOPLE *v.* LAVAN.
PEOPLE *v.* LEVINSON.

1. Joint Adventures—Contract with State—Newspaper Publishers—Liability for Loss.

Arrangement whereby publisher which had been designated by auditor general to publish tax sale notices pursuant to statute requiring him to designate but one publisher in a county agreed with two other publishers in same county to pay them a share for their help in getting out the publication was not a joint adventure where only the designee was responsible for performance of the contract with the State and liable for any loss thereunder (1 Comp. Laws 1929, § 3455, as amended by Act No. 37, Pub. Acts 1939).

2. Larceny—Title of Money.

In prosecution for larceny by conversion of a portion of a publisher's share of profits from contract with State for publication of tax sale notices where designee publisher authorized reduction of amount payable to designee's distributee, defendant was not guilty of larceny by conversion from designee's distributee since the title to the money before distribution had not passed from designee (1 Comp. Laws 1929, § 3455, as amended by Act No. 37, Pub. Acts 1939; Act No. 328, § 362, Pub. Acts 1931).

3. Same—Principal and Agent—Dismissal of Embezzlement Count—Title of Money.

In prosecution under information charging defendants with larceny by conversion and with embezzlement where embezzlement count was dismissed before case went to jury and title to money represented in warrant on State treasurer had not passed from payee therein who authorized defendants to pay to certain other parties a lesser sum than had previously been agreed to by payee, fact that defendants may have been agents of such other parties was immaterial.

Appeal from Ingham; Hayden (Charles H.), J. Submitted June 12, 1942. (Docket Nos. 70, 71, Calendar Nos. 41,852, 41,853.) Decided November 25, 1942.

Martin Lavan and Hyman Levinson were convicted of larceny by conversion. Reversed.

*John P. O'Hara* for appellant Martin Lavan.

*Thomas F. Chawke* and *Paul G. Eger,* for appellant Hyman Levinson.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Richard B. Foster* and *Victor C. Anderson,* Prosecuting Attorneys, for the people.

NORTH, J. Defendants Martin Lavan and Hyman Levinson appeal from convictions by a jury of the crime of larceny by conversion, charged under Act No. 328, § 362, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 17115–362, Stat. Ann. § 28.594). The information filed against them reads:

"That heretofore, to-wit, on the 21st day of April, A. D. 1938, at the city of Lansing and in the county of Ingham aforesaid one Martin Lavan and Hyman Levinson, late of the city of Lansing and county of Ingham aforesaid, being persons to whom certain money, to-wit:

"$7,600 belonging to another, namely Pontiac News Company, a copartnership consisting of James Little and Ben Ronan, had been delivered, did through and by means of a fraudulent and felonious conspiracy between themselves and with others unknown, embezzle and fraudulently convert to their own use a part thereof, to-wit, $2,600, in violation of section 362 of the Michigan penal code."

A second count, charging that the two defendants embezzled this money as agents of Little and Ronan was dismissed just before the case went to the jury, and the verdict of the jury limited the convictions to the offense of larceny by conversion.

The charges herein arose from the circumstances under which the publisher was designated and the contract made for the publication of delinquent tax sales notices in Oakland county for the year 1938. Defendants are charged with converting part of Little and Ronan's share of the profits from this publication.

By statute, 1 Comp. Laws 1929, § 3455, amended by Act No. 37, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 3455, Stat. Ann. 1942 Cum. Supp. § 7.108), it is the duty of the auditor general to designate a newspaper to publish these notices. Defendant Lavan was the legal advisor to the then auditor general George Gundry and seems to have handled details as to the designation of such publisher. Defendant Levinson was a newspaper publisher in Oakland county, owning and operating the *Farmington Enterprise* at Farmington, Michigan.

During the summer of 1937, Levinson and two other Oakland county publishers, Charles S. Seed of the *Rochester Clarion* and James Little, who operated the *Pontiac News* along with his partner, Ben Ronan, were each making efforts to be designated as publisher of the delinquent tax sales notices; or at least to secure a share in the prospective profits therefrom. On August 30, 1937, Lavan called the three publishers to his office in Lansing and asked if they had reached an agreement. They had not, and he sent them to a nearby hotel to draw up one. They came back with one which he concluded was not legally binding. He thereupon prepared one which provided that, having been designated to

publish the notices by the auditor general, Seed agreed to engage the services of Levinson and Little and their papers to assist him and he would pay each of the men three-eighths of any profits therefrom. The designation and contract for publication were given to Seed on that same day. Despite the wording of the contract, it was agreed that each of the three should receive one-quarter and the other one-quarter was to be divided among four other newspapers in the county.

Since none of the three publishers had a printing plant capable of handling the printing job and since it was questionable even whether Little's paper was qualified legally to publish the notices, the three parties selected a Livingston county printer to do the actual printing at a cost of $9,000. However, Seed's paper did distribute the notices. The contract provided that Levinson and Little were to help finance the undertaking; but the parties seem to have had trouble raising the $9,000, and eventually this money was advanced by the State. When the publication and distribution were completed, Charles S. Seed & Son, as publishers of the *Rochester Clarion* officially designated to publish the notices, were entitled to receive from the State approximately $43,000 less the sum of $9,000 which had been advanced. After deduction of other individual expenses, some $31,000 profit remained to be divided.

During the course of the publication, friction developed among the parties to the agreement to the point where they virtually ''could not agree on anything.'' It was finally decided that they would get Lavan to decide how much each of the parties was to receive and to have the State make out separate warrants representing each share, though all would have to be payable to the designated publisher, Seed. The figure finally decided on as representing a one-

quarter share of the profits was about $7,700. Seed ultimately received two State warrants totaling $10,005.64 from which he testified he paid his expenses amounting to $2,250, leaving approximately $7,750 as his share. On April 13, 1938, he received his first warrant in Lavan's office and also indorsed one for $7,625 representing Levinson's share and one for $7,600 which was to go to Little's paper. Another warrant for $9,015.36, which does not seem to be involved in this suit, was indorsed by him at that time. The latter three warrants were left with Lavan, seemingly for distribution.

On the next day, April 14, 1938, Levinson appeared at a Lansing bank, after being introduced by Lavan over the telephone, and cashed his warrant for $7,625 and the one for $9,015.36. Both warrants had been made payable by the State to the *Rochester Clarion* and had been indorsed by Seed "The Rochester Clarion, C. S. Seed & Son, C. S. Seed." The bank cashier, apparently believing Levinson was Seed, did not have Levinson indorse them. On April 21, 1938, Levinson again appeared at this bank and cashed the $7,600 warrant which Lavan had told Seed was to go to Little. The next day Levinson purchased a cashier's check from a Detroit bank for $5,000 payable to Little and his partner Ronan which Lavan gave to Little on April 25, 1938, saying it was all Little would get and he "could take it or leave it."

Meanwhile, Seed testified, Lavan had called him up April 14th, in regard to the Little payment, stating he felt Little was getting too much:

"*A.* On the 14th day of April, the day after I got my check—the first check—he called me up and says, 'Charley, I don't think that division we made yesterday was entirely satisfactory.' He says, 'I think you should have more, being the designated

paper.' And then he asked me what I thought about Mr. Little's getting $7,600. He said he thought $5,000 was a plenty, and he said that I would get the balance, what he took off from Mr. Little—gave me to understand that over the phone.

"*Q.* You agreed that was all right?

"*A.* I did."

Seed never got the $2,600 difference. It is the claim of the State that this money belonged to Little and Ronan, and that Levinson and Lavan converted it to their own uses. The State admits it must prove the $2,600 actually belonged to Little and Ronan in order to convict defendants of the charge in the information. However, the State contends:

"The actual intention of the parties was that they were to perform equally and jointly and share equally. * * *

"The intention, and performance in accordance with the intention, was that the undertaking was a joint enterprise."

On the other hand, defendants claim that the warrant for $7,600, averred in the information to belong to Little and Ronan, was really the property of Seed, the designated publisher; and that only the relationship of debtor and creditor existed between Seed and Little or between Seed and Little and his partner Ronan. And further it is claimed that Lavan, in delivering the cashier's check for $5,000 to Little instead of the $7,600 warrant, acted with the authority and consent of Seed.

Did this $2,600 belong to Seed, or did it belong to Little? The answer to this question depends on whether the publication was a joint adventure under which each was entitled to a share directly, or whether Seed's paper was designated by the State to get out the publication and he hired the other two to

help him and agreed to pay them each a share for such help, as their contract provided. The statute, 1 Comp. Laws 1929, § 3455, amended by Act No. 37, Pub. Acts 1939, requires the auditor general to designate *one* paper in the county. The auditor general designated Seed's paper only. Seed thereby became responsible for performance of the publication contract and liable for any possible loss. The State was bound to pay Seed alone, and the warrants were made out to his newspaper, the *Rochester Clarion.* Nowhere in the record did the parties themselves call this a joint adventure. Nor do their actions indicate they felt it was such. Under their contract, Levinson and Little were not bound to share in any loss as required in a joint adventure, *Hathaway* v. *Porter Royalty Pool, Inc.,* 296 Mich. 90, 102 (138 A. L. R. 955). They were merely to assist Seed. He testified: "I figured I did all the work.  *  *  *  I felt I did most of the work and I got the designation, and whatever Mr. Levinson got and Mr. Little got it was pretty easy money for both, and it wasn't easy money for me because I did all the work." Though Seed testified that they did help him some in selecting the printer and in distribution as provided for in the contract, he also testified: "When I became the designated publisher I knew it was my responsibility to get out the publication, and I knew that I was the one that the State would pay."

Thus it seems clear that this was not a joint adventure. What really happened was that Seed was given the designation as official publisher subject to his agreeing to distribute some of the profits to the other papers in order to engender good will more generally among Oakland county newspapers. Little's claim under his contract with Seed should be directed against Seed. Seed did indorse a warrant for $7,600 with the understanding that it was to be paid to Little. However, the next day, and before

delivery of the warrant to Little, Seed countermanded that order and instructed Lavan to pay only $5,000. Little himself testified that he had to look to Seed for any money he might get. So the $5,000 was the only money that ever actually became Little's. Since the $2,600 was never given or turned over by Seed to Little, title or ownership of this money never passed to Little, and there was no conversion by either of the defendants of money which belonged to Little or to Little and Ronan.

We are mindful the State argues that Lavan promised to represent Little's interests and so was his agent to accept the $7,600 warrant. But the second count charging defendants with being agents of Little and Ronan and with embezzling $2,600 as such agents was dismissed by the State and the jury found defendants guilty of larceny by conversion only. Also, while Little stated at one point he had made a claim against Seed after he had accepted the $5,000 check in settlement in full from Lavan, he testified:

"I never made any demand on Mr. Lavan for any money in addition to that amount ($5,000) after that time, or Mr. Levinson. I never started a civil action to sue Mr. Lavan or Mr. Levinson or Mr. Seed, and I did not sign the complaint in this case here."

Since the $2,600 never was the property of Little and Ronan as is charged in the information, defendants cannot be guilty of having fraudulently converted it from Little and Ronan. Therefore, defendants' convictions and sentences must be vacated. Under this decision, other errors charged by defendants need not be considered.

CHANDLER, C. J., and BOYLES, STARR, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., did not sit.