In re Charles S. KRAUS, Debtor.

Frances HOLMES, Plaintiff,

v.

Charles S. KRAUS, Defendant.

Bankruptcy No. 83–00627.
Adv. No. 83–0259.

United States Bankruptcy Court,
E.D. Michigan, S.D.,
Flint.

Feb. 1, 1984.

Bruce A. Newman, P.C., Anthony J. Mansour, Flint, Mich., for plaintiff.

Carl L. Bekofske, Flint, Mich., for defendant/debtor.

## MEMORANDUM OPINION

STANLEY B. BERNSTEIN, Bankruptcy Judge

Introduction:

The plaintiff, Frances Holmes, (plaintiff) filed her complaint to determine the non-dischargeability of a state court judgment which she had obtained in the principal amount of $58,000, plus costs, interest, and attorney's fee against the debtor-defendant, Charles S. Kraus, (debtor) on May 27, 1983. The debtor filed his Chapter 7 petition on July 19, 1983.

The findings of fact made by the state court judge in support of his judgment are difficult to separate from his summary of the trial testimony. The following findings of fact are adopted for the purpose of this adversary proceeding:

1). The debtor was the owner/operator of a filling station and automotive repair facility for a number of years, including the time period during which the underlying dispute arose.

2). The parties to this dispute entered into two written business agreements.

3). The first agreement, dated October 20, 1978, provided for a loan from the plaintiff to the debtor's business in the amount of $29,000. This loan was to be paid back within six to nine months, and the debtor agreed to be personally liable for repayment.

4). On May 22, 1979, the parties entered into a second agreement in which the defendant sold a one-third interest in his business to the plaintiff for the sum of $50,000. The plaintiff was to receive one-third of the business's profits with a guaranteed annual return of $4,000; she was not, however, granted any interest in the real estate of the business. The $29,000 previously loaned to the debtor by the plaintiff was applied to the purchase price and the plaintiff paid the outstanding balance of $21,000.

5). At the time of the second agreement, the debtor represented to the plaintiff that the business had a going concern value of $150,000 and generated annual profits of $10,000 to $18,000 over the past fifteen years. These figures materially misrepresented the financial condition of the business—it had earned either small profits or incurred losses in the years immediately preceding the agreements. The debtor's business records were incomplete and inaccurate.

6). The debtor did not file an appropriate partnership or assumed name certificates to reflect the plaintiff's acquisition of an interest in the business.

7). The debtor failed to furnish the plaintiff financial statements covering the operations of the business.

8). No distributions of profits or guaranteed payments were ever made to the plaintiff.

9). The debtor paid himself a salary from the cash flow of the business even though there was no provision in the second agreement authorizing such withdrawals.

10). The following disbursements made by the debtor were in breach of the provisions of the second agreement.

| | |
|---|---|
| Shortages Per Accounting | $23,247.00 |
| Dairy Queen Payments | 19,058.41 |
| Political Contributions | 120.00 |
| Citizens Bank Gas Station Expenses | 21,672.95 |
| Van Payments | 4,815.83 |
| Sorscher Payment | 2,682.00 |
| Roof Repair | 1,560.78 |
| Miscellaneous Loans | 1,317.94 |
| Illegible Check | 4,724.34 |
| Miscellaneous Draw | 600.00 |
| | $79,799.25 |

Based upon these findings of fact, the state court concluded that the second contract formed a joint venture and that as a matter of law the debtor had breached his fiduciary duties owed to the plaintiff as a joint venturer. Damages were awarded to the plaintiff in the principal amount of $58,000, plus costs, interest and attorney fees.

Analysis:

The plaintiff seeks to have her claim determined to be non-dischargeable under 11 U.S.C. § 523(a)(4):

A discharge under section 727, 1141, or 1328(6) of this title does not discharge an individual debtor from any debt

\* \* \* \* \* \*

for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

This subsection of the Code has been construed by the Sixth Circuit in *Carlisle Cashway, Inc. v. Johnson (In re Johnson)* 691 F.2d 249 (6th Cir.1982).[1] In *Johnson,* the plaintiff sought to have a debt determined to be non-dischargeable when the debtor made payments under a construction contract in violation of the Michigan Building Contract Fund Act, M.C.L.A. §§ 570.151–153. The Sixth Circuit reversed the bankruptcy and district courts' rulings that the debt was dischargeable. The court restated the criteria for defining and applying "fiduciary capacity" under § 523(a)(4). Initially, the court noted that the definition of fiduciary in bankruptcy is a matter of federal law, "although state law is important in determining when a trust relationship exists." 691 F.2d at 251 (footnote omitted). The court then held:

> The term "fiduciary" applies only to express or technical trusts, which are imposed on transactions by operation of law as a matter of equity. Moreover, the requisite trust relationship must exist prior to the act creating the debt and without reference to it. State statutes which impose a trust ex-maleficio are not within the scope of section 17(a)(4) since such trusts only arise upon an act of misappropriation.

*Id.* at 251–52 (citations omitted). In applying this rule to the facts in *Johnson,* the Sixth Circuit found that the Michigan Building Contract Fund Act created a true trust relationship with statutorily imposed fiduciary duties:

> The Michigan Building Contract Fund Act imposes a "trust" upon the building contract fund paid by any person to a contractor or subcontractor for the benefit of the person making the payment, contractors, laborers, subcontractors and materialmen. The contractor or subcontractor receiving the payments is the "trustee". The statute imposes a duty upon the trustee to use the money in the building contract fund to first pay laborers, subcontractors and materialmen on the particular project for which the funds were deposited before he uses the fund for any other purpose. Any contractor or subcontractor, who, with intent to defraud, retains or uses any portion of the building contract fund for any purpose other than to first pay the trust beneficiaries, is guilty of a felony in appropriating trust funds to his own use. The appropriation by a contractor or subcontractor of any monies in the building contract fund before the payment of monies due or to become due trust beneficiaries, is evidence of intent to defraud. That the statute does not mandate any particular form or procedures in handling trust funds neither undercuts the validity of the trust nor renders the statute unconstitutionally vague. The Building Contract Fund Act may give rise to a civil cause of action as well as criminal penalties.

*Id.* at 252 (citations omitted).

■ This Court cannot agree with the state court that the contract between these parties created a joint venture relationship.[2]

---

[1] Although the bankruptcy case involved in *Johnson* was a case under the Bankruptcy Act of 1898, there is no case law which indicates that the interpretation of fiduciary capacity as used in former 11 U.S.C. § 17(a)(4) is any different than the section under the Code 11 U.S.C. § 523(a)(4).

[2] Some courts, both under the Act and now under the Code, have defined "fiduciary" very narrowly to find debts non-dischargeable. One noteworthy opinion found such a construction too restrictive and in contravention to the principles of bankruptcy:

> The courts have attempted to avoid making Section 17(a)(4) so broad that it reaches such ordinary commercial relationships as debtor-creditor and principal-agent.
>
> The purpose of the Bankruptcy Act, as stated in *Hamby v. St. Paul Mercury Indemnity Co.,* 217 F.2d 78, 81 (4 Cir.1954), "is to grant a discharge of honest debts to honest debtors, not to grant discharges to those who

In *Berger v. Mead,* 127 Mich.App. 209, 338 N.W.2d 919 (1983), the Michigan Court of Appeals reiterated the six elements of a joint venture:

A joint venture has six elements:

"(a) an agreement indicating an intention to undertake a joint venture;

"(b) a joint undertaking of;

"(c) a single project for profit;

"(d) a sharing of profits as well as losses;

"(e) contribution of skills or properties by the parties;

"(f) community interest and control over the subject matter of the enterprise." *Meyers v. Robb,* 82 Mich App 549, 557; 267 NW2d 450 (1978), *lv den* 403 Mich 812 (1978). The key consideration is that the parties intended a joint venture. *Goodwin v. S.A. Healy Co.,* 383 Mich 300; 174 NW2d 755 (1970); *Hathaway v. Porter Royalty Pool, Inc.,* 296 Mich 90; 295 NW 571; 138 ALR 955 (1941).

*Id.* at 214–15, 338 N.W.2d 919.

The state court record does not support the conclusion that these parties intended to create a joint venture. The express limitation to a single transaction to be conducted as a joint venture is missing.

The court admits that the relationship between these parties is difficult to define; it more closely conforms to the statutory definition of partnership:

Sec. 6. (Partnership Defined)

(1) A partnership is an association of 2 or more persons, which may consist of husband and wife, to carry on as co-owners a business for profit....

M.C.L.A. § 449.6(1). This Court, therefore, holds that the May 22 agreement between the parties created a partnership.

This conclusion is supported by both statutory and case law authority. In a case on point, the Michigan Supreme Court held that an agreement to share in the profits of a business constitutes strong evidence of intent to form a partnership. *Corey v. Cadwell,* 86 Mich. 570, 49 N.W. 611 (1891). In

have dishonestly misappropriated funds entrusted to them."

*Corey,* the plaintiff originally loaned money to the defendant to enable the defendant to purchase a tract of timber; the loan was to be repaid with interest. When the defendant later wished to obtain further capital from the plaintiff to buy timber, the parties agreed that instead of repayment of these loans with interest that the "net proceeds ... either from sale of land, lumber, timber, or shingles, after paying [the amount contributed by the plaintiff], and all expenses of manufacturing, transportation, and sale, shall be equally divided between the parties." *Id.* at .572, 49 N.W. 611. Thus, as in this case, a transaction originally structured as a loan became a partnership when the lender stopped receiving loan payments and instead agreed to a sharing of the business profits.

The rule in *Corey* has been restated in more modern cases to mean that the sharing of profits, while not conclusive, is *prima facie* evidence of a partnership under Michigan law. *See Lobato v. Paulino,* 304 Mich. 668, 8 N.W.2d 873 (1943), *Grosberg v. Michigan National Bank Oakland,* 113 Mich.App. 610, 318 N.W.2d 490 (1982), *Falkner v. Falkner,* 24 Mich.App. 633, 180 N.W.2d 491 (1970).

This rule has been codified by the Uniform Partnership Act as adopted in Michigan. M.C.L.A. § 449.7 states in pertinent part:

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

(a) As a debt by installments or otherwise,

(b) As wages of an employe or rent to a landlord,

(c) As an annuity to a widow or representative of a deceased partner,

(d) As interest on a loan, though the amount of payment vary with the profits of the business,

*Inahara v. Harris (In re Harris),* 458 F.Supp. 238, 243 (D.Or.1976). This Court concurs with the *Harris* court.

(e) As the consideration for the sale of the good-will of a business or other property by installments or otherwise.

None of the exceptions are applicable in the present situation; although (a) or (d) might appear applicable at first blush, there is nothing in the contract between these parties which indicates that the plaintiff's receipt of profits was to cease when her contribution was recouped or for any other reason. To the contrary, the contract states that the defendant agreed *to sell* a one-third interest in the business to Ms. Holmes. Thus in the absence of any testimony or contract provision rebutting the presumption of partnership (and no such evidence appears in this record), a partnership exists.

■ The Uniform Partnership Act as adopted in Michigan like the Building Contract Fund Act, imposes fiduciary duties upon partners in their dealings with each other. M.C.L.A. § 449.21 states:

(1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property; . . .

The Uniform Partnership Act established an *express trust* for which each partner acts as a trustee. The trust is created before the act creating the debt and without any reference to that debt. M.C.L.A. § 449.21 satisfies the *Johnson* criteria for establishing a fiduciary relationship.

■ The distinction between a partnership and a joint venture is not meaningful in this proceeding. The fiduciary relationship is the same regardless of how one labels the relationship. As Judge (and later Justice) Cardozo stated in the landmark opinion on this topic:

Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions (*Wendt v. Fischer*, 243 N.Y. 439, 444, 154 N.E. 303). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by this court.

*Meinhard v. Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928). Any citation to other authority would be gratuitous.

■ In this case, a trust was created by the second agreement but the obligation of the debtor to the plaintiff did not accrue until the first payment of profit was due, *i.e.*, May 22, 1980. As such, a fiduciary relationship, as contemplated by § 523(a)(4), existed between the parties to this dispute [3] prior to the time the so-called "debt" arose.

■ The state trial court found that the debtor had not committed fraud, but was

---

**3.** The text of the May 22, 1979 agreement states in full:

This Agreement is between Charles S. Kraus and Frances Holmes, of 1801 Nebraska, Flint, Michigan. Charles S. Kraus is the owner of a Gasoline Station on the Northeast Corner of Franklin and Davison Road in the City of Flint, County of Genesee and State of Michigan. He agrees to sell one-third (⅓) of his Filling Station and Automotive Repair Business to Frances Holmes for the price of Fifty Thousand Dollars ($50,000.00). Under the terms of this Agreement Frances Holmes will then be entitled to one-third (⅓) of the profits of the Business. (with a gart=e [sic] of [at] least 4000.00 Dollars per year) This Purchase of one-third (⅓) of the Business does not entitle Frances Holmes to any interest in the Real Estate which is owned by Charles S. Kraus. (on the Corner of Franklin & Davison in Genesee County)

The parenthetical material was a handwritten addition, initialed by the defendant.

liable to the plaintiff for his breach of fiduciary duties to her. That court's finding of "no fraud" is neither controlling nor dispositive in this proceeding. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). The breach of fiduciary duties committed by the debtor constitutes defalcation and is a basis sufficient to except from discharge the plaintiff's claim as a state court judgment creditor.

Defalcation has been defined as:

The act of a defaulter; act of embezzling; failure to meet an obligation; *misappropriation of trust funds* or *money held in any fiduciary capacity; failure to properly account for such funds....*

Black's Law Dictionary 375 (5th ed. 1979) (emphasis added).

This definition follows the leading judicial opinion of Judge Learned Hand in *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937). He found that the use of the term defalcation, in the context of bankruptcy, extended beyond defaults resulting from deliberate malversation, to encompass all innocent defaults, "so as to include all fiduciaries who for any reason were short in their accounts." *Id.* at 511.

The *Central Hanover* construction of defalcation was adopted and refined by the Sixth Circuit in *Johnson*. 691 F.2d at 254–55. After preliminarily finding that there was no legislative history interpreting "defalcation," nor is any restrictive term associated with its use in the Act (or the Code), the court of appeals concluded that no special mental element was contained in its definition.

The court in *Johnson* found *Central Hanover* to support this proposition in an indirect but logical fashion. The Second Circuit held in *Central Hanover* that misappropriation probably entailed more misconduct than did defalcation.[4] Although the Second

Circuit assumed that some misconduct was required to constitute a defalcation, it held on the facts in Central Hanover that the mere taking of money entrusted to a fiduciary constituted a defalcation; the defendant's actual knowledge of his fiduciary duties was not probative. The Sixth Circuit in *Johnson* thus concluded that "innocent defaults" properly fell within the scope of a defalcation. 391 F.2d at 255. *See also Corey Lumber Co. v. Bell*, 615 F.2d 370 (5th Cir.1980).

The *Johnson* court further found Michigan to be among those states which had determined that defalcation, as used in the bankruptcy context, "was intended to cover defaults other than deliberate malversions and includes a mere deficit resulting from a fiduciary's duty to make the proper payment of money coming into his possession." 691 F.2d at 255, *citing Citizens Mutual Automobile Insurance Co. v. Gardner*, 315 Mich. 689, 24 N.W.2d 410 (1946).

In the present proceeding, this Court agrees with the state court's findings that numerous disbursements were made by the debtor in breach of his fiduciary duties under M.C.L.A. 449.21, and that such a breach properly constitutes a defalcation. Therefore, this Court determines that the full state court judgment is a non-dischargeable debt of the debtor under 11 U.S.C. § 523(a)(4).

A separate judgment has been entered.

---

4. Section 17(a)(4) of the Act excepted from discharge debts created by fraud, embezzlement, misappropriation of defalcation while acting in a fiduciary capacity. There is no indication that the omission of "misappropriation" from the § 523(a)(4) of the Code in any

way changes the meaning of "defalcation" Logic would indicate that no such change occurred, since if defalcation is *broader* than misappropriation it must *a fortiori* encompass it. *Appliance Buyers Credit Union v. Tocci (In re Tocci)*, 34 B.R. 66 (Bkrtcy.S.D.Fla.1983).