*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PATRICIA KAISER,

      Plaintiff/Counterdefendant/Third-Party Plaintiff-Appellant,

and

ON TIME VEHICLE SUPPLY, LLC, doing business as INTEGRITY VEHICLE SOLUTIONS,

      Plaintiff/Counterdefendant-Appellant,

v

PATRICK LANGAN and P, B, AND J TRANSPORT, LLC, doing business as DASH AUTO LOGISTICS,

      Defendants/Counterplaintiffs-Appellees,

and

EXPERT VEHICLE SOLUTIONS, LLC,

      Counterplaintiff,

and

THOMAS STODDART,

      Third-Party Defendant.

UNPUBLISHED
December 12, 2025
10:29 AM

No. 369969
Oakland Circuit Court
LC No. 2022-195822-CB

Before: ACKERMAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

-1-

Plaintiffs Patricia Kaiser and her company, On Time Vehicle Supply, LLC, and defendants Patrick Langan and his company, P, B, and J Transport, LLC, agreed to operate a business providing vehicles and related logistics for automotive clients under the name Expert Vehicle Solutions, LLC (EVS). Their relationship later deteriorated, and this litigation followed. Plaintiffs obtained partial relief in the trial court but now appeal from the judgment dismissing their remaining claims.[1] We affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Kaiser worked in the business of short-term vehicle acquisitions for approximately 15 years, providing vehicles for automotive events and auto shows. In 2018, she created On Time, a Michigan limited liability company. Langan is the sole owner of PB&J, a transportation company that did business under the assumed name DASH Auto Logistics. In 2019, DASH employee Kenneth Spencer introduced Kaiser and Langan because Kaiser was seeking funding for On Time, which had not yet conducted any business.

Because of the COVID-19 pandemic and other personal reasons, it was not until February 11, 2021, that DASH executed a written agreement ("2021 Agreement") with On Time. Under the agreement, DASH and On Time agreed to "operate and put on auto shows under the name EXPERT VEHICLE SOLUTIONS, LLC [EVS]," and "the intent of the operation [was] to provide auto shows on a nationwide basis." DASH committed to "provide the funding, transportation, logistics and bookkeeping," while On Time agreed to provide "operational expertise" and to be "responsible for all operations including auto shows, dates and all related operations to the auto shows in training." The agreement further provided that DASH would receive 60% of EVS's net profits, and On Time would receive 40%.

The agreement was signed by Langan and Kaiser, on behalf of DASH and On Time, respectively, at a meeting at a bowling alley. Spencer testified that at this meeting, Langan said to Kaiser, " 'Aren't you glad that you own your own company now? You don't have to be worried about somebody stealing from you like LaFontaine and Suburban, these big boys. You are your own company.' " Articles of incorporation establishing EVS as a Michigan limited liability company were filed with the Department of Licensing and Regulatory Affairs (LARA) on February 16, 2021. The filing listed Langan as the resident agent and indicated that EVS was "Managed By: Members." Langan testified that he signed this paperwork two days before executing the 2021 Agreement, although it was not accepted by LARA until February 16, 2021.

For the remainder of 2021, the parties performed under the agreement, and EVS was successful, generating between $400,000 and $450,000 in profits. Those profits were distributed

---

[1] Kaiser also filed a third-party complaint against Thomas Stoddart, who is not involved in this appeal. For simplicity, Kaiser and On Time/IVS are referred to collectively as "plaintiffs," and the proceedings involving Stoddart are not discussed in this opinion. Likewise, Langan and PB&J/DASH are referred to collectively as "defendants." Defendants and counterplaintiff EVS also filed counterclaims against plaintiffs, but the trial court's rulings on those counterclaims are not challenged on appeal and are not addressed.

between the parties in the 60/40 split required by the agreement. Each month, Kaiser provided Langan with project figures, and Langan made the resulting distributions.

In 2022, DASH hired William Paulson, and Langan asked Kaiser to train Paulson in EVS's business operations. Kaiser and Paulson did not get along, and in June 2022, their deteriorating working relationship triggered a broader breakdown between Kaiser and Langan, as reflected in their text message exchanges. When Kaiser expressed a desire to replace Paulson, Langan asked to be more involved in EVS by being included in discussions and e-mails with customers regarding quotes and leases. Kaiser refused. In a series of unanswered text messages, Kaiser asked Langan whether he was still funding EVS and then asserted that he was in breach of the 2021 Agreement.

Langan ultimately responded on June 20, 2022, stating that funding would resume once he received documents that he had requested. That same day, Langan's attorney sent Kaiser a letter making the same demand. On June 23, 2022, Kaiser filed an assumed-name registration with LARA, changing On Time's name to Integrity Vehicle Solutions, or "IVS." The following day, Kaiser e-mailed a representative of Volkswagen, one of EVS's biggest customers, indicating that IVS had separated from DASH and EVS but remained willing and able to complete any pending projects.

Plaintiffs filed this action in August 2022, alleging the following 10 counts: breach of contract, fraud, concert of action, civil conspiracy, common-law conversion, statutory conversion, defamation, breach of fiduciary duty, tortious interference with a business relationship or expectancy, and entitlement to an accounting. Many of these claims were predicated on plaintiffs' assertion that the 2021 Agreement created a joint venture and that defendants failed to distribute plaintiffs' 40% of EVS profits.

Defendants moved for summary disposition under MCR 2.116(C)(8) and (10), arguing primarily that the 2021 Agreement did not create a joint venture or partnership, that plaintiffs held no ownership interest in EVS, and that plaintiffs' claims therefore failed as a matter of law.

The trial court concluded that a genuine issue of material fact existed regarding whether the agreement created a joint venture but ruled that the agreement terminated on or about June 20, 2022, and plaintiffs' contractual rights ceased at that point. The court denied in part defendants' motion as to the breach-of-contract claim, ruling that plaintiffs were entitled to 40% of EVS's net profits from May 1 to June 20, 2022, and granted plaintiffs summary disposition on that issue under MCR 2.116(I)(2). The court otherwise granted defendants summary disposition on all remaining claims.

Plaintiffs moved for reconsideration, which the trial court denied. The parties later settled the amount owing for plaintiffs' 40% share of profits between May 1 and June 20, 2022, and a final judgment was entered. This appeal followed.

## II. STANDARDS OF REVIEW

Defendants moved for summary disposition under MCR 2.116(C)(8) and (10). This Court reviews a trial court's decision to grant or deny summary disposition de novo. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 229; 964 NW2d 809 (2020).

Summary disposition is proper under MCR 2.116(C)(8) when "[t]he opposing party has failed to state a claim on which relief can be granted." A motion filed under this subrule "tests the legal sufficiency of a claim based on the factual allegations in the complaint." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019) (emphasis omitted). The trial court must accept all factual allegations as true and decide the motion on the pleadings alone. *Id*. at 160. A motion under MCR 2.116(C)(8) may be granted only when "a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*.

Summary disposition is proper under MCR 2.116(C)(10) when "the affidavits or other documentary evidence, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Glasker-Davis*, 333 Mich App at 229 (quotation marks and citation omitted). "The moving party must first specifically identify the issues as to which it believes there is no genuine issue as to any material fact, and has the initial burden of supporting its position with affidavits, depositions, admissions, or other admissible documentary evidence." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475; 776 NW2d 398 (2009) (cleaned up). If that burden is met, it then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Id*. The nonmoving party may not rely on mere allegations or denials in the pleadings but must set forth specific facts showing that a genuine issue of material fact exists. *Id*. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

Resolution of many of the issues on appeal requires contract interpretation, which presents questions of law reviewed de novo. *Patel v FisherBroyles, LLP*, 344 Mich App 264, 271; 1 NW3d 308 (2022).

> This Court's goal in interpreting a contract is always to ascertain and give effect to the intent of the parties as reflected in the plain language of the contract. The words of a contract are interpreted according to their plain and ordinary meaning, and this Court gives effect to every word, phrase, and clause while avoiding interpretations that would render any part of the document surplusage or nugatory. An unambiguous contract term must be enforced as written unless contrary to public policy. A contract is ambiguous if it is capable of irreconcilably conflicting interpretations. If a contract is ambiguous, the proper interpretation presents a question that must be decided by the fact-finder. [*Id*. at 271-272 (quotation marks and citations omitted).]

### III. BREACH OF CONTRACT

Although the trial court denied defendants summary disposition of plaintiffs' breach-of-contract claim related to their 40% share of EVS's net profits, plaintiffs argue on appeal that the court erred by limiting their recovery to the period of May 1 to June 20, 2022, and by denying their request for an accounting. We disagree.

To establish a breach-of-contract claim, a plaintiff must "establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting

-4-

in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). Plaintiffs claimed that defendants breached the 2021 Agreement by failing to distribute to plaintiffs 40% of EVS's net profits in 2022 and by failing to provide plaintiffs with an accounting of EVS's finances. The trial court awarded plaintiffs relief for unpaid distributions before June 20, 2022. On appeal, plaintiffs contend that they retained contractual rights after that date.

The crux of plaintiffs' argument on appeal relies on their assertion that the 2021 Agreement created a joint venture. A joint venture is an "association[] to carry out a single business enterprise for a profit." *Alfieri v Bertorelli*, 295 Mich App 189, 199; 813 NW2d 772 (2012). To establish a joint venture, a plaintiff must show:

> (a) an agreement indicating an intention to undertake a joint venture; (b) a joint undertaking of (c) a single project for profit; (d) a sharing of profits as well as losses; (e) contribution of skills or property by the parties; [and] (f) community interest and control over the subject matter of the enterprise. [*Kay Investment Co, LLC v Brody Realty No 1, LLC*, 273 Mich App 432, 437; 731 NW2d 777 (2006) (cleaned up).]

A joint venture "arises only when [the parties] intend to associate themselves as such. This intention is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts." *Id*. at 439 (cleaned up).

The nature of the parties' relationship is difficult to discern from the agreement, which is sparse in detail. The agreement is simply titled "Agreement" and provides that EVS would produce "auto shows and related dealerships training." Langan testified that he believed On Time and DASH were agreeing to work for EVS, which he described as "his" company. Yet when asked whether Kaiser was "hired by" EVS under the agreement, Langan said he did not know. He stated that Kaiser was "being used for her operational experience" and "being paid for her service." But he acknowledged that the agreement contained no language stating that Kaiser had been hired by defendants. Kaiser, on the other hand, referred to EVS as On Time's "partner" but also described EVS as a "joint venture between [PB&J] and [On Time] to provide vehicle acquisition to the automotive manufacturer agencies that it supplied." She testified that she believed she "was a partner in the joint venture." Spencer testified that he was the "middle man" in creating the business between Kaiser and Langan, which he described as a "partnership." On this record, the trial court concluded that a question of fact existed as to whether the parties intended to form a joint venture.

We agree that this is a plausible interpretation of the 2021 Agreement. The agreement reflects a joint commitment by both parties to "operate and put on auto shows" under the EVS name, with defined profit sharing. Although the agreement did not expressly label the relationship as a joint venture, it also does not resemble a typical employment or service-provider arrangement. Langan's testimony that plaintiffs were merely working for EVS could reasonably be viewed as post hoc reframing of the relationship. Nor does the fact that EVS's filings list only Langan as a member foreclose the possibility of a joint venture. "If it be the manifest intention of the parties to enter upon a joint venture, the employment of the corporate mechanism [does] not negative the existence of such relationship." *Hathaway v Porter Royalty Pool*, 296 Mich 90, 108; 295 NW 571

-5-

(1941), amended 296 Mich 733 (1941). And while the agreement did not expressly address the allocation of losses, loss in the context of a joint venture "does not necessarily mean actual 'monetary loss,' " because loss of "the value of . . . time . . . , while not quite as concrete or measurable as . . . cash investment, is nevertheless a loss." *Summers v Hoffman*, 341 Mich 686, 693; 69 NW2d 198 (1955). A factfinder could therefore conclude that the parties formed a joint venture.

That issue, however, is ultimately immaterial to plaintiffs' post-termination breach-of-contract claims. The June 2022 text message exchange between Kaiser and Langan demonstrates a clear breakdown in their business relationship. After that exchange, Kaiser informed Volkswagen that she and her company had "separated from" EVS but were still "ready to manage the projects we have priced and discussed with you" under the new business name of Integrity Vehicle Solutions. These communications objectively reflect termination of the 2021 Agreement on or about June 20, 2022.

The trial court therefore properly concluded that plaintiffs' contractual rights to a 40% share of EVS's net profits ended with the termination of the agreement. Plaintiffs were properly awarded damages only for May 1 to June 20, 2022, the period during which defendants admitted that no distributions were made. Plaintiffs failed to establish any breach before May 1, 2022, when distributions were made, or after June 20, 2022, when the agreement had ended. The fact that defendants continued operating EVS after termination did not entitle plaintiffs to a share of subsequent profits, as those projects were performed after the agreement was terminated. The agreement made plaintiffs "responsible for all operations including auto shows, dates and all related operations to the auto shows in training," and once the relationship ended, they ceased performing that contribution. Because no genuine issue of material fact existed as to the agreement's termination, plaintiffs' recovery was properly limited.

Plaintiffs also challenge the trial court's dismissal of their breach-of-contract claim based on defendants' alleged failure to provide an accounting. A party claiming breach of contract must identify the specific contractual provision that was breached. See *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 554; 904 NW2d 192 (2017). The 2021 Agreement imposes a responsibility for "bookkeeping" on DASH but contains no provision requiring defendants to provide plaintiffs with a formal accounting. The only concrete harm alleged in plaintiffs' complaint is that "Defendants have failed to deliver to Plaintiffs their contractually prescribed 40% of profits."[2] The trial court awarded relief for that injury. Because the agreement imposed no duty

---

[2] We acknowledge that the record contains references to specific transactions to which EVS was apparently a party that were concluded after June 20, 2022, but in which plaintiffs might conceivably claim some interest. Examples include the bill to The BF Group, discussed in part V, *infra*, and Volkswagen's invoice, discussed in part VI, *infra*. While we agree with the trial court that plaintiffs are not entitled to an open-ended claim on *all* EVS profits after the relationship ended, if EVS realized *these* gains as a result of the operational contributions plaintiffs made before the venture collapsed, plaintiffs might well have a claim to a portion of them. But plaintiffs—who are in the best position to know what transactions they arranged and what work they performed— pleaded no specific allegations regarding these transactions. Tellingly, plaintiffs' briefing

to provide an accounting, the trial court properly dismissed plaintiffs' breach-of-contract claim in this regard.

## IV. FRAUD

Plaintiffs next argue that defendants committed fraud because Langan allegedly made false representations to Kaiser that she would have an ownership interest in EVS while secretly intending to retain sole ownership. We disagree. Plaintiffs failed to establish the elements necessary to support a fraud claim.

There are three theories under which fraud may be established: (1) traditional common-law fraud, (2) innocent misrepresentation, and (3) silent fraud. *Coosard v Tarrant*, 342 Mich App 620, 633; 995 NW2d 877 (2022). Plaintiffs' claim sounds solely in common-law fraud, and as such, they must establish that:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. [*Id*. (quotation marks and citation omitted).]

Plaintiffs alleged in their fraud claim that Langan made false representations to plaintiffs, which plaintiffs relied on to enter and perform the 2021 Agreement, but Langan intended all along to "co-opt" plaintiffs' business relationships for himself. The alleged misrepresentation is based primarily on Spencer's testimony that at the February meeting where the agreement was signed, Langan said to Kaiser, " 'Aren't you glad that you own your own company now? You don't have to be worried about somebody stealing from you like LaFontaine and Suburban, these big boys. You are your own company.' " Spencer further testified that no one present indicated that EVS would be owned solely by Langan at that time. But Spencer also testified that Langan did not begin asserting sole ownership of EVS until after the parties' relationship deteriorated in June 2022. Prior to that point, according to Spencer, Langan referred to Kaiser as a "partner," praised her work, and spoke positively about the profitability of their collaboration.

Kaiser attested that she relied on Langan's bowling alley statements when entering into the agreement. But when asked whether those statements were false when made, or whether Langan knew them to be false at the time, Kaiser answered:

> You know, honestly, maybe that isn't—it was stated incorrectly in that particular item [of the complaint]. Probably not—I don't know at that time if it was false. But there came a time that, you know, that it was—he had other intentions. But it was later. So, I don't know if it was at the time that we wrote this.

---

discusses these transactions only in connection with their defamation and tortious interference claims, not in support of their breach-of-contract claim.

Kaiser acknowledged in her affidavit that she had expressed "honest uncertainty as to **when** Langan's intentions became other than what he originally expressed in February, 2021, in Spencer's presence." (Emphasis in original.) That said, she believed Langan had a habit of "promising great financial gains to his prospective business partners, then reneg[ing]" based on his past business dealings and pending lawsuits.

This evidence does not satisfy the third element of common-law fraud, which is that the defendant knew a representation was false when made or acted recklessly as to its truth. *Id.* Kaiser's own testimony confirms that she did not know if Langan's bowling alley representation was false when made. Moreover, the undisputed evidence establishes that the parties performed under the 2021 Agreement for more than a year and that EVS was profitable during that time. The course of performance undercuts plaintiffs' claim that Langan harbored a secret intent to defraud from the outset.

Because plaintiffs failed to establish a genuine issue of material fact as to whether any material misrepresentation was known to be false when made, the trial court properly granted defendants summary disposition of plaintiffs' fraud claim under MCR 2.116(C)(10).

## V. DEFAMATION

Plaintiffs next contend that statements made by Langan and Paulson regarding plaintiffs' ownership interest in EVS and about Kaiser personally were defamatory. We find no error in the trial court's dismissal of plaintiffs' defamation claims.

"A communication is defamatory if, under all the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or deters others from associating or dealing with the individual." *Johnson v Mich Minority Purchasing Council*, 341 Mich App 1, 17; 988 NW2d 800 (2022) (cleaned up). To establish defamation, the plaintiff must prove:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Id.* (quotation marks and citation omitted).]

"With the first element of a defamation claim being a false statement, it naturally follows that a statement which is 'substantially true' is a defense to a charge of defamation by implication." *Lawrence v Burdi*, 314 Mich App 203, 214-215; 886 NW2d 748 (2016). A defendant, however, is not required to prove that any statement "is literally and absolutely accurate in every minute detail." *Id.* at 215 (cleaned up).

Privilege is available as a defense to a defamation claim. *Johnson*, 341 Mich App at 17. "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Id.* at 17-18 (quotation marks and citation omitted). A plaintiff may overcome qualified privilege by showing actual malice, meaning knowledge of falsity or reckless

disregard for the truth. *Id*. at 18. We review de novo whether a privilege exists. *Cetera v Mileto*, 342 Mich App 441, 446-447; 995 NW2d 838 (2022).

Plaintiffs first alleged that Langan falsely told EVS clients that he was the sole owner of EVS and that Kaiser was a liar. The trial court properly concluded these statements were not actionable.

The documented record shows that Langan was at all relevant times a member of EVS and that Kaiser was not listed as a member in any LARA filings. Although the articles of organization listed EVS as "Managed By: Members," the December 2021 annual filing identified Langan alone as a "member." There is no evidence that Kaiser was a member of the LLC, and the plain language of the agreement entitled plaintiffs only to 40% of EVS's net profits. As a result, Langan's statement that he was the owner of EVS was substantially true and therefore not defamatory. See *Lawrence*, 314 Mich App at 214-215.

Plaintiffs also alleged that Paulson and Langan told clients that EVS was not being shut down, which caused irritation among customers. On June 24, 2022, Kaiser received an e-mail from Volkswagen representative Jan Hoepfner in response to an inquiry she sent regarding a pending project. Hoepfner wrote:

> I'm pretty confused now what's going on here. [Paulson] called me yesterday and informed me that you left EVS. . . . Both purchase orders have been issued to EVS from [the Volkswagen] side. We cannot switch this over to IVS that easy. I'm irritated as well, that you requested to remove EVS as vendor while [Paulson] still seems to be operating under this company.

Hoepfner sent Kaiser a second e-mail on June 27, 2022, confirming that Volkswagen had "to proceed for past and existing orders with EVS. This is essential to stay compliant with our business operation rules. We may get in touch for any new inquiries with you."

On July 1, 2022, Paulson e-mailed Brad Funk, the representative of another EVS client, The BF Group, stating:

> As you may have heard, regrettably [Kaiser] no longer works for EVS. I have spent my week reaching out to vendors and trying to shore everything up. In some recent discussions with vendors, it appears there may have been some misleading information given. I want to assure you that EVS is still a company and still solely owned by the same person as always, Patrick Langan. We will continue to strive to provide you the best service and vehicles we can. I know we have some projects that are yet to be invoiced. . . . I imagine there will be some confusion and I want to make sure we are all on the same page.

On July 5, 2022, in response to Funk's inquiry about an invoice, Paulson stated that he had only recently learned of IVS through communications with other EVS clients, that EVS had no relationship with IVS, and that The BF Group was obligated to pay the company with which it had contracted, EVS. On July 12, 2022, EVS's attorney likewise e-mailed Funk that The BF Group's contract was with EVS, that any monies due and owing should be paid to EVS, and that all matters would be worked out as the agreement between On Time and EVS was "wrap[ping] up." Paulson

also acknowledged contacting Nissan to inform it that Kaiser was no longer with EVS and to remove her from its internal systems as it related to EVS; he did not recall doing this for Volkswagen.

The trial court found that defendants' outreach to EVS customers was undertaken to protect EVS's business interests and did not bear on Kaiser's reputation. We agree. Hoepfner's e-mail indicates only that he was told Kaiser had "left" EVS, a statement that was not false in light of the breakdown of the parties' relationship. Likewise, Paulson's statement to Funk that there may have been "some misleading information given" does not rise to the level of defamation. See *Johnson*, 341 Mich App at 17.

Plaintiffs next assert that Langan defamed Kaiser by telling vehicle wholesaler Brett Whiting that Kaiser lacked authority to rent vehicles and had misrepresented her ownership status. Assuming for the sake of argument that this statement was false,[3] it is not actionable absent proof of special harm. "[S]tatements about a person's property, business, trade, profession, or occupation" do not constitute defamation per se. *Cetera*, 342 Mich App at 454. Plaintiffs therefore were required to establish special damages resulting from the alleged publication. *Id*. Plaintiffs failed to identify any special harm attributable to this statement.

Plaintiffs also asserted that Langan falsely told a Nissan representative that Kaiser merely changed one letter of the company's name and that he still owned EVS. The record conclusively establishes that Kaiser changed On Time's assumed name to IVS three days after the parties' last exchange in June 2022, creating a name that differed by a single letter from EVS. That aspect of Langan's statement was therefore true. Likewise, as discussed, Langan's statement that he owned EVS was substantially true. Because truth is an absolute defense to defamation, this claim also fails. See *Lawrence*, 314 Mich App at 214-215.

Lastly, plaintiffs claim that Langan made defamatory statements through derogatory comments and name-calling directed at Kaiser. Spencer testified that after Kaiser and Langan stopped working together in mid-June 2022, Langan told Spencer that he was going to "destroy" Kaiser and referred to her using derogatory language. Spencer further testified that Langan continued speaking disparagingly about Kaiser in the DASH office for several months. Although Spencer did not personally hear Langan make defamatory statements about Kaiser to clients, he testified that Langan implied that he had contacted Volkswagen, Nissan, and other clients and told them that Kaiser was unauthorized, stealing, or otherwise acting improperly. Spencer also testified that Langan said, "I just got off the phone with Nissan. She's f***ed," and that Langan would "brag about how he's contacting everybody, and she'll never work in this business again."

The trial court correctly held that these statements are not actionable as defamation because they consist of subjective expressions of opinion that cannot be proven false. Expressions of opinion are not defamatory. *Hope-Jackson v Washington*, 311 Mich App 602, 621; 877 NW2d 736 (2015). Subjective statements that cannot be proven as false are not actionable as defamatory.

---

[3] As this litigation and our extended analysis should make clear, the exact nature of plaintiffs' ownership interest in this business arrangement was, at minimum, unclear and disputable.

See *Ireland v Edwards*, 230 Mich App 607, 617; 584 NW2d 632 (1998). Langan's alleged remarks therefore constitute nonactionable opinion rather than defamatory statements of fact.

Because plaintiffs failed to establish that any of the alleged statements met the requirements for defamation, the trial court properly dismissed the claim under MCR 2.116(C)(10).

## VI. TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

Plaintiffs next argue that defendants tortiously interfered with several business relationships or expectancies plaintiffs had with EVS clients. We conclude that the trial court properly dismissed this claim.

To establish tortious interference with a business relationship or expectancy, the plaintiff must prove: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff." *Hope Network Rehab Servs v Mich Catastrophic Claims Ass'n*, 342 Mich App 236, 245-246; 994 NW2d 873 (2022) (cleaned up). As to the third element, interference alone is insufficient; the plaintiff must show that the defendant acted intentionally and either improperly or without justification. *Id*. at 246. This requires proof of "a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Id*. (cleaned up). If the defendant's actions were motivated by legitimate business reasons, they do not constitute improper interference. *Id*. at 246-247.

Regarding the third and fourth elements, "an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and [] resultant damage to the plaintiff," *id*. at 246, the record contains evidence concerning only two customers, Volkswagen and Nissan. The trial court correctly concluded that plaintiffs failed to establish a breach or termination of any business relationship caused by defendants' conduct.

As to Volkswagen, the evidence shows that shortly after the parties' agreement ended, Kaiser contacted Volkswagen regarding a pending project. Volkswagen responded that the relevant purchase orders had already been issued to EVS, that Volkswagen therefore had to proceed with EVS to comply with its "business operation rules," and that it might contact Kaiser for future projects. Defendants' completion of an existing EVS contract constitutes a legitimate business reason and not wrongful interference. And because Volkswagen expressly indicated the possibility of future work with Kaiser, plaintiffs failed to establish that defendants' conduct caused either a breach of an existing business relationship or the termination of any reasonable business expectancy.

As to Nissan, plaintiffs rely primarily on Spencer's testimony that Langan intended to "destroy" Kaiser and claimed to have contacted Nissan. While this testimony supports a potential inference of intentional conduct motivated by malice, plaintiffs failed to present any evidence that defendants' alleged conduct actually caused a breach or termination of plaintiffs' relationship or expectancy with Nissan. Absent proof of causation and resulting damages, plaintiffs cannot satisfy the third or fourth elements of the claim.

-11-

Because plaintiffs failed to establish each required element of tortious interference with a business relationship or expectancy, the trial court properly granted defendants summary disposition under MCR 2.116(C)(10).

## VII. BREACH OF FIDUCIARY DUTY

Next, plaintiffs argue that the trial court erred by dismissing their claim for breach of fiduciary duty, asserting that defendants owed plaintiffs fiduciary duties under the 2021 Agreement and breached those duties by "ousting" plaintiffs from EVS. We disagree.

A fiduciary relationship arises "from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Highfield Beach at Lake Mich v Sanderson*, 331 Mich App 636, 666 n 13; 954 NW2d 231 (2020) (cleaned up). "A person in a fiduciary relation to another is under a duty to act for the benefit of the other with regard to matters within the scope of the relation." *Id*. (cleaned up). "To establish a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages caused by the breach of duty." *Id*. at 666. "A breach of fiduciary duty arises when a person holding a position of influence and confidence abuses the influence and betrays the confidence." *Id*. at 666 n 13.

"A claim for breach of fiduciary duty sounds in tort." *Id*. at 666 (quotation marks omitted). Plaintiffs allege that defendants breached fiduciary duties by withholding funding unless certain documents were produced and by effectively removing plaintiffs from EVS. But each of these alleged duties arises solely from the parties' contractual relationship under the 2021 Agreement. To maintain a tort action, a plaintiff must establish that the defendant owed a legal duty "separate and distinct" from the duties imposed by the contract. See *Loweke v Ann Arbor Ceiling & Partition Co*, 489 Mich 157, 167; 809 NW2d 553 (2011). Claims grounded in the breach of contractual obligations are not actionable in tort. *Urbain v Beierling*, 301 Mich App 114, 132; 835 NW2d 455 (2013). Because plaintiffs identify no independent duty arising outside the contract, their claim for breach of fiduciary duty fails as a matter of law. This conclusion is dispositive, so we decline to address plaintiffs' remaining arguments regarding this claim.

## VIII. CONVERSION

Plaintiffs argue that the trial court misunderstood and misapplied the economic-loss doctrine and, as a result, improperly dismissed their claims for common-law and statutory conversion. We disagree.

Common-law conversion is "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distrib Servs, Inc*, 497 Mich 337, 346; 871 NW2d 136 (2015) (cleaned up). Under MCL 600.2919a(1), a person is damaged and may recover as the result of "[a]nother person's stealing or embezzling or converting property to the other person's own use." Statutory conversion "requires a showing that the defendant employed the converted property for some purpose personal to the defendant's interests, even if that purpose is not the object's ordinarily intended purpose." *Aroma Wines & Equip, Inc*, 497 Mich at 361.

Plaintiffs' claims for both common-law and statutory conversion are based on the same alleged conduct as their breach-of-contract claim: defendants' failure to distribute plaintiffs' 40% share of EVS's profits. Plaintiffs relied on their expert's opinion that defendants withheld approximately $37,182 in profits from May 1 through June 20, 2022. Plaintiffs also emphasized evidence that Langan made substantial withdrawals from EVS's account after June 2022 for personal expenditures.

In granting summary disposition, the trial court correctly noted that these claims are barred because plaintiffs' alleged injury arises entirely from defendants' failure to perform under the 2021 Agreement. "[T]he essence of the 'economic loss' rule is that contract law and tort law are separate and distinct, and the courts should maintain that separation in the allowable remedies." *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 371; 532 NW2d 541 (1995) (citation omitted). "[T]he failure to perform a contractual duty cannot give rise to a tort action unless the plaintiff alleges a violation of a duty separate and distinct from the underlying contractual obligation." *Smith Living Trust v Erickson Retirement Communities*, 326 Mich App 366, 395; 928 NW2d 227 (2018) (citation omitted).

Here, no such independent duty exists. Plaintiffs' claimed right to the allegedly converted money arose solely from the 2021 Agreement's profit-sharing provision. Defendants' alleged failure to distribute those profits therefore constitutes at most a breach of contract, not conversion. Plaintiffs' conversion claims are therefore legally indistinguishable from their contract claim and fail as a matter of law.

Because defendants owed no duty independent of the 2021 Agreement and plaintiffs' conversion claims arise entirely from alleged nonpayment of contractual profits, the trial court properly granted summary disposition of plaintiffs' conversion claims.

IX. CIVIL CONSPIRACY AND CONCERT OF ACTION

Lastly, plaintiffs argue that the trial court erred by dismissing their claims for civil conspiracy and concert of action. We disagree.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Swain v Morse*, 332 Mich App 510, 530; 957 NW2d 396 (2020) (cleaned up). A civil conspiracy requires proof of an underlying, actionable tort, which in this context must be "a civil wrong that arises from the breach of a legal duty other than the breach of a contractual duty." *In re Bradley Estate*, 494 Mich 367, 381; 835 NW2d 545 (2013). Similarly, to establish a claim for concert of action, a plaintiff must prove "that all defendants acted tortiously pursuant to a common design that caused harm to the plaintiff." *Urbain*, 301 Mich App at 132. As with civil conspiracy, the existence of underlying tortious conduct is a necessary prerequisite. *Id*.

Here, plaintiffs' conspiracy and concert-of-action claims were predicated on their allegations of fraud, defamation, conversion, tortious interference, and breach of fiduciary duty. As discussed above, each of those underlying tort claims fails as a matter of law. Because no actionable tort remains to support either theory, plaintiffs' derivative claims for civil conspiracy and concert of action necessarily fail. Accordingly, the trial court properly granted defendants

summary disposition of plaintiffs' civil conspiracy and concert-of-action claims under MCR 2.116(C)(10).

## X. CONCLUSION

The final judgment entered by the trial court, which limited plaintiffs' recovery to damages for breach of contract arising from unpaid profit distributions through June 20, 2022, and dismissed plaintiffs' remaining claims for an accounting, fraud, defamation, tortious interference with a business relationship or expectancy, breach of fiduciary duty, common-law conversion, statutory conversion, civil conspiracy, and concert of action, is affirmed. Having prevailed in full on appeal, defendants may tax costs under MCR 7.219.

/s/ Matthew S. Ackerman
/s/ Stephen L. Borrello
/s/ Anica Letica